# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔉𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔯𝔰𝔱 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

## IN RE: MOTION TO QUASH ADMINISTRATIVE SUBPOENA TO RHODE ISLAND HOSPITAL

UNITED STATES,

*Respondent-Appellant*,

v.

CHILD ADVOCATE FOR THE STATE OF RHODE ISLAND,

*Petitioner-Appellee,*

RHODE ISLAND HOSPITAL,

*Intervenor-Appellee.*

*On Appeal from the United States District Court for the District of Rhode Island; Judge Mary S. McElroy, Case No. 1:26-mc- 00007-MSM-AEM*

## BRIEF OF AMICUS CURIAE RHODE ISLAND MEDICAL SOCIETY IN SUPPORT OF PETIONER-APPELLEE AND AFFIRMANCE

Eric M. Gold
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
(617) 646-1400

*Counsel for Rhode Island Medical Society*

404969700.4

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amicus curiae* Rhode Island Medical Society certifies that (i) it is a non-governmental corporation; (ii) it has no parent corporation; and (iii) no publicly held corporation owns ten percent or more of its stock.

404969700.4

**TABLE OF CONTENTS**

Page

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.......................................i

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES ............................................................ iii

IDENTITY AND INTEREST OF AMICUS CURIAE.............................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................2

ARGUMENT ...........................................................................3

I.    Government Demands For Patient Records Without a Proper Purpose Infringe on Physicians' Free Speech Rights.......................................3

      A.    Physician Counseling to Patients, as Reflected in Medical Records, Is Protected Speech. ....................................................3

      B.    Government Subpoenas for an Improper Purpose Implicate the First Amendment.................................................................7

      C.    First Amendment Concerns Are Heightened Where Government Demands Are Content Based. .........................................9

II.   Government Access to Medical Records for an Improper Purpose Undermines Patient Trust and the Patient-Physician Relationship..............11

      A.    Confidentiality is Foundational to Effective Medical Care. ..............12

      B.    Access to Treatment Depends on Confidentiality, Including Access to Care Beyond the Relationship in Which the Trust was Breached..14

CONCLUSION........................................................................18

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(g)......................20

CERTIFICATE OF SERVICE .......................................................21

404969700.4

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996)................................................................10

*Americans for Prosperity Foundation v. Bonta,*
    594 U.S. 595 (2021)................................................................7

*Bates v. Little Rock,*
    361 U.S. 516 (1960)................................................................7

*Chiles v. Salazar,*
    146 S. Ct. 1010 (2026)........................................................*passim*

*Conant v. Walters,*
    309 F.3d 629 (9th Cir. 2002) .............................................3, 4, 6, 7

*Dobbs v. Jackson Women's Health Org.,*
    597 U.S. 215 (2022)................................................................14

*Gibson v. Fla. Legislative Investigation Comm.,*
    372 U.S. 539 (1963)................................................................7

*In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.,*
    No. 1:26-MC-0007-MSM-AEM, 2026 WL 1329792 (D.R.I. May 13,
    2026) ................................................................8

*National Institute of Family and Life Advocates v. Becerra,*
    585 U.S. 755 (2018)................................................................6, 10

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
    505 U.S. 833 (1992)................................................................5

*Police Dep't v. Mosley,*
    408 U.S. 92 (1972)................................................................8, 9

*Roe v. Wade,*
    410 U.S. 113 (1973)................................................................14

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
    515 U.S. 819 (1995)................................................................9

*Rust v. Sullivan,*
    500 U.S. 173 (1991)................................................................5

404969700.4

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011) ..........................................................................*passim*

*Trammel v. United States*,
    445 U.S. 40 (1980) ........................................................................................4

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994) ......................................................................................6

*United States v. Shinderman*,
    432 F. Supp. 2d 149 (D. Me. 2006), *aff'd*, 515 F.3d 5 (1st Cir. 2008) ..............17

*Whyte v. Connecticut Mut. Life Ins. Co.*,
    818 F.2d 1005 (1st Cir. 1987) ......................................................................16

*Wollschlaeger v. Governor of Florida*,
    848 F.3d 1293 (11th Cir. 2017) (en banc) ...................................................9, 12

**STATUTES**

42 U.S.C. § 290dd-2 ........................................................................................16

Comstock Act of 1873, ch. 258, 17 Stat. 598 .....................................................4

**OTHER AUTHORITIES**

First Amendment ...................................................................................*passim*

Amy Casselman-Hontalas et al., *Discourses of Distrust: How Lack of Trust
    in the U.S. Health-Care System Shaped COVID-19 Vaccine Hesitancy*,
    10 Russell Sage Found. J. Soc. Sci. 154 (2024) ...............................................17

Carly Parnitzke Smith, *First, Do No Harm: Institutional Betrayal and Trust
    in Health Care Organizations*, 10 J. of Multidisciplinary Healthcare 133
    (2017) ........................................................................................................18

Ellen W. Grabois, *The Liability of Psychotherapists for Breach of
    Confidentiality,* 12 J.L. & Health 39 (1998) .............................................12, 13

Janet L. Dolgin, *Physician Speech and State Control: Furthering Partisan
    Interests at the Expense of Good Health*, 48 New Eng. L. Rev. 293
    (2014) ..........................................................................................................4

Joshua D. Safer, *Barriers to Health Care for Transgender Individuals*, 23
    Current Opinion in Endocrinology, Diabetes & Obesity 168 (Apr. 2016) ........16

Karl Swanson et al., *Effect of Recent Abortion Legislation on Twitter User
    Engagement, Sentiment, and Expressions of Trust in Clinicians and
    Privacy of Health Information: Content Analysis*, 25 J. Med. Internet
    Rsrch. 1 (2023) .........................................................................................14, 15

404969700.4

Kate Gallen et al., *Health Effects of Policing in Hospitals: A Narrative Review*, 20 J. Racial & Ethnic H. Disparities 870 (2023) ...................................16

Meghna Shukla et al., *Medical Mistrust: A Concept Analysis*, 15 Nurs. Rep. 103 (2025) ........................................................................15, 17

National Association of Pediatric Nurse Practitioners, *NAPNAP Position Statement on the Care of Lesbian, Gay, Bisexual, Gender Diverse, Transgender, Questioning, Queer, Intersex, Two-Spirit, and Asexual (LGBTQ+) Youth*, 31 J. of Pediatric Health Care 947 (2024)............................13

Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201 (1994) ........................................................................18

Wendy A. Bach & Nicholas Terry, *HIPAA v. Dobbs*, 38 Berkeley Tech. L. J. 609 (2023) ........................................................................15

## **RULES**

Fed. R. App. P. 29(a)(4)(E).........................................................................1

Fed. R. App. P. 29(a)(5)...........................................................................20

Fed. R. App. P. 32(a)(6)...........................................................................20

Fed. R. App. P. 32(a)(7)(B) .......................................................................20

Fed. R. App. P. 32(g) .............................................................................20

404969700.4

# IDENTITY AND INTEREST OF AMICUS CURIAE

The amicus curiae files this brief pursuant to Fed. R. Civ. P. 29.[1] All parties have consented to the filing of this brief.

The Rhode Island Medical Society ("RIMS") is a statewide association of Rhode Island physicians, physician assistants, and medical students. RIMS's mission is to advance the art and science of medicine, advocate for physicians and their patients, and improve the health of all Rhode Islanders. Consistent with that mission and as one of the oldest state medical societies in the nation founded in 1812, RIMS represents and advocates for the interests of the medical profession and Rhode Island physicians' ability to provide their patients with compassionate and high-quality care. RIMS has long advocated for policies that preserve the confidentiality of the patient-physician relationship, protect physicians' ability to exercise independent clinical judgment, and ensure patients have access to evidence-based medical care.

RIMS regularly appears before the Rhode Island General Assembly, state agencies, and other governmental bodies on issues affecting patient care, physician professionalism, and the practice of medicine. Its advocacy has consistently

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel states that (i) RIMS's counsel authored this brief in whole; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (iii) no person other than RIMS contributed money that was intended to fund preparing or submitting the brief.

404969700.4

focused on protecting patient confidentiality, preserving physician clinical independence, reducing unnecessary government and administrative interference in the practice of medicine, and ensuring physicians can provide evidence-based care in the best interests of their patients. RIMS's participation in this case reflects those longstanding institutional interests.

Confidentiality is indispensable to effective medical care. Patients must be able to seek treatment, disclose sensitive information, and engage candidly with their physicians without fearing that their records may later be obtained and scrutinized by the government for purposes unrelated to their care. If patients lose confidence that the information they share with their physicians will be protected, they may delay or forgo treatment altogether, leading to concrete harm. RIMS has a substantial interest in ensuring that the patient-physician relationship remains a protected space for honest medical communication and care and that courts continue to safeguard the privacy interests that make that relationship possible.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

RIMS has a longstanding interest in litigation affecting the patient-physician relationship, patient confidentiality, and physicians' ability to provide medically appropriate care consistent with professional standards and ethical obligations, unconstrained by harmful government intrusion. Improper subpoenas burden First Amendment rights by targeting or chilling protected physician speech and

404969700.4

professional judgment, particularly where the government's purpose is unrelated to legitimate enforcement and instead implicates viewpoint or content concerns.

The patient-physician relationship depends on confidentiality and candor. If individuals believe their medical records may be accessed by the government for improper or non-health-related purposes, they will be less likely to discuss their health concerns openly and could forgo needed care altogether. This risk is especially acute for patients receiving health care that has been stigmatized, leading to reduced candor, impaired diagnosis, and worse health outcomes.

These principles extend beyond gender-affirming care and apply with equal force broadly across the physician-patient relationship.

## ARGUMENT

The Court should affirm the order below quashing the subpoena to Rhode Island Hospital. Government demands for patient records without a proper purpose infringe on physicians' First Amendment rights. And when the government gains access to patient records—without a proper purpose—it undermines patient confidentiality, the foundation of the patient-physician relationship.

**I.    Government Demands For Patient Records Without a Proper Purpose Infringe on Physicians' Free Speech Rights.**

    **A.    Physician Counseling to Patients, as Reflected in Medical Records, Is Protected Speech.**

The First Amendment protects physicians' speech to their patients from

404969700.4

improper Government intrusion. *See Chiles v. Salazar*, 146 S. Ct. 1010, 1024 (2026) (holding mental health counselor's talk therapy was protected speech); *Conant v. Walters*, 309 F.3d 629, 636–37 (9th Cir. 2002) (holding that the First Amendment protects a physician's professional speech with patients). Courts have long recognized the threat of Government intrusion on a physician's right to free speech, and the integral role candid verbal exchange plays in physician-patient relationships. *E.g.*, *Trammel v. United States*, 445 U.S. 40, 51 (1980) (there is an "imperative need for confidence and trust" in the doctor-patient relationship). "History is littered with examples of official efforts to manipulate and control professional speech—including 'the content of doctor-patient discourse'—in ways designed 'to increase state power,' 'suppress minorities,' and muzzle 'unpopular ideas.'" *Chiles*, 146 S. Ct. at 1024.[2] "An integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients," *Conant*, 309 F.3d at 636–37.

The transmission of medical information from doctor to patient is speech entitled to broad protection under the First Amendment. *Chiles*, 146 S. Ct. at 1024.

---

[2] The United States has a long and recurring history of government efforts to control the content of doctor-patient discourse. *See, e.g.*, Comstock Act of 1873, ch. 258, 17 Stat. 598 (criminalizing the mailing of contraception and abortion information, treating physician communications with patients as "obscene"); *see generally* Janet L. Dolgin, *Physician Speech and State Control: Furthering Partisan Interests at the Expense of Good Health*, 48 New Eng. L. Rev. 293 (2014).

404969700.4

The First Amendment protects the transmission of speech, including oral and written communications from a physician to their patient providing treatment and making recommendations, and extending to communications reflected in a patient's medical records. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570–71 (2011) (finding speech in aid of pharmaceutical marketing—and by extension, prescribing information—protected expression subject to heightened scrutiny); *id.* ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."); *see Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992) (plurality) (recognizing physician's First Amendment right not to speak); *Rust v. Sullivan*, 500 U.S. 173, 200 (1991) (regulations on physician speech may "impinge upon the doctor-patient relationship"). When a physician treats a patient, the physician offers a diagnosis, prognosis, counseling on risks and benefits, and treatment recommendations, all of which are protected speech memorialized in medical records. *See Chiles*, 146 S. Ct. at 1023–24.

Physician-patient communications remain protected by the First Amendment even though they occur in a professional setting. In *Chiles v. Salazar*, the Court rejected the notion that "professional speech" from a health care clinician to their patient received lesser constitutional protection. 146 S. Ct. at 1022–23. Instead, the Court held that a state law restricting what a licensed counselor could say to clients

regulated speech, not conduct, and was subject to First Amendment scrutiny. *Id.* The Court previously explained that "[s]peech is not unprotected merely because it is uttered by professionals," and "[a]s with other kinds of speech, regulating the content of professionals' speech 'pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information.'" *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 756, 771 (2018) [hereinafter *NIFLA*] (quoting *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994)).

Physicians' guidance to patients receives robust First Amendment protection because it is uniquely vulnerable to government-induced chill. Physicians practice under state licenses, and the threat that a licensing board or legislature will penalize the content of clinical advice inevitably drives physician self-censorship and leaves patients unable to make informed decisions when their doctors cannot freely provide care recommendations. *See Conant*, 309 F.3d at 638–39. The dangers of censorship are "no less acute in the fields of medicine and public health" than anywhere else. *Chiles*, 146 S. Ct. at 1025 (internal quotations omitted).

Physicians provide patient guidance about treatments for a medical condition—including off-label use of a medication—almost entirely through speech by explaining how the medication works, describing the risks and benefits

of the treatment, and recommending a course of action. Physicians then memorialize the guidance in the patient's medical record, describing the risks and benefits of potential treatments and recommending a course of action. When a physician counsels a patient about off-label pharmaceutical usage, these communications, whether verbal or written, are protected speech under the First Amendment. *See Chiles*, 146 S. Ct. at 1024; *Conant*, 309 F.3d at 636–37.

B. Government Subpoenas for an Improper Purpose Implicate the First Amendment.

Government-compelled disclosure itself restrains First Amendment freedoms and is, therefore, subject to exacting scrutiny. Federal investigative pressure "strike[s] at core First Amendment interests of doctors and patients," and chills physicians' expression when improperly deployed. *Conant*, 309 F.3d at 636–37. The government "is not free to enforce *any* disclosure regime that furthers its interests" when "[t]he lack of tailoring to the State's investigative goals is categorical." *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 613, 615 (2021); *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 544 (1963) (The rights of free speech and association are "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference" (quoting *Bates v. Little Rock*, 361 U.S. 516, 523 (1960))).

404969700.4

This is because even without directly prohibiting a type of treatment or speech, compelling disclosure through a subpoena chills protected expression. *Conant*, 309 F.3d at 636–37 (federal investigative and licensure-revocation threats were sufficient to trigger First Amendment scrutiny and injunctive relief). *See Sorrell*, 564 U.S. at 565–66 (recognizing that speech-burdening regulations chill protected expression even absent a direct penalty).

When government action is improper and makes it costly for a speaker to convey certain information, the government action chills protected speech. The District Court found the Subpoena here improper based on the "public record" because "[t]he Administration . . . directed the DOJ to bring its practice to an end, and celebrated when hospitals curtailed such programs as a result of this subpoena campaign." *In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, No. 1:26-MC-0007-MSM-AEM, 2026 WL 1329792, at *8 (D.R.I. May 13, 2026). Where, as here, the Government's purpose in demanding patient records is to curtail lawful activities that the Government disagrees with, the investigation implicates the First Amendment. Investigations that burden protected speech risk deterring physicians from providing medically sound patient counseling for fear of government retaliation.

404969700.4

### C. First Amendment Concerns Are Heightened Where Government Demands Are Content Based.

The First Amendment forbids restricting expression "because of its message, its ideas, its subject matter, or its content." *Police Dep't v. Mosley*, 408 U.S. 92, 95 (1972). *See also Chiles*, 146 S. Ct. at 1023 (determining state law banning treatment that attempts to change an individual's sexual orientation was a content-based restriction); *Sorrell*, 564 U.S. at 569–70 (laws restricting the sale, disclosure, and use of prescriber-identifying information for marketing were "content- and speaker-based restrictions" and "require[] heightened judicial scrutiny."); *Police Dep't v. Mosley*, 408 U.S. 92, 95 (1972) (holding ordinance that prohibited picketing near school except peaceful labor picketing unconstitutional because it drew lines based on subject matter). When the government targets the speaker's views on the subject, it is an "egregious form" of content regulation that violates the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Any government action that targets what a doctor may say regarding patient treatment is content based because it singles out speech based on its topic and is subject to heightened scrutiny. *See Chiles*, 146 S. Ct. at 1022–23; *see also Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1314-15 (11th Cir. 2017) (en banc) (invalidating restrictions on physician inquiries and recordkeeping regarding patient firearm ownership as content-based speech regulations that failed heightened First Amendment scrutiny).

404969700.4

The likelihood of a First Amendment violation is greatest where subpoenas focus on health care treatments that have been stigmatized and scrutinized by government officials and the public. The Government has acknowledged in another case seeking to quash a subpoena for patient records that its investigations have been aimed at "eliminat[ing] the medicalized gender-affirming care of minors." *See* Tr. of Mot. Hr'g 25:14-17, In Re: Administrative Subpoena No. 25-1431-019, 1:25-mc-91324 (D. Mass. Sep. 1, 2025), ECF No. 30. That admission converts an administrative subpoena, which could otherwise be a neutral regulatory tool, into an instrument of unconstitutional viewpoint discrimination.

The First Amendment protects speech so that the government cannot simply prohibit content it disagrees with. "The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *Sorrell*, 564 U.S. at 577 (quoting *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996)) (internal quotations omitted). The state may not restrict truthful medical information because the speech is "disfavored" or out of fear that patients will make "bad decisions" with it. *Sorrell*, 564 U.S. at 577.

Without vehement protection of personal and professional First Amendment rights, "any professional speech that deviates from 'current beliefs about the safety and efficacy of various medical treatments' could be silenced with relative ease."

404969700.4

*Chiles*, 146 S. Ct. at 1029. It is imperative in many sectors, including health care, that licensed professionals "have a host of good-faith disagreements" about the "prudence" and "ethics" of various practices in their fields. *NIFLA*, 585 U.S. at 772; *Chiles*, 146 S. Ct. at 1029. Medical consensus is not static; it continues to evolve. A prevailing standard of care may reflect what most practitioners believe today, but it cannot limit what clinicians may say tomorrow. Far from a test of professional consensus, the First Amendment rests instead on a simple truth: "[T]he people lose" whenever the government transforms prevailing opinion into enforced conformity. *Id.* at 1029. When the government demands information about specific physicians' prescribing choices aimed at influencing or deterring the content of medical practice, "the State has burdened a form of protected expression that it found too persuasive." *Sorrell*, 564 U.S. at 565, 580.

## II. Government Access to Medical Records for an Improper Purpose Undermines Patient Trust and the Patient-Physician Relationship.

Confidentiality is the foundation of the patient-physician relationship. When the government compels disclosure of sensitive, personal medical information for purposes unrelated to patient care and divorced from legitimate government aims, it damages the trust that is a foundation for effective medical treatment. When patients lose trust in their physicians, they are less candid and less engaged with medical institutions overall. Patients who do not trust that information they share with their treating doctors will remain confidential are less likely to engage

11

candidly with their physicians, less likely to seek care, and consequently experience worse health outcomes. These harms are not confined to gender-affirming care. The Government's compelled disclosure of sensitive medical records for an improper purpose risks significant damage to the patient-physician relationships on which a functioning health care system depends.

A.    Confidentiality is Foundational to Effective Medical Care.

Patients' ability to trust that the information they share with their physicians will be protected from government intrusion is an essential element of the provision of medical care. Courts and society writ large understand that the patient-physician relationship must be protected in part because "in the fields of medicine and public health … information can save lives." *Sorrell*, 564 U.S. at 566. Indeed, "[h]ealth-related information is more important than most topics because it affects matters of life and death;" because physicians "help patients make deeply personal decisions, . . . their candor is crucial." *Wollschlaeger*, 848 F.3d at 1328 (concurrence).

Physicians must be able to cultivate a relationship of trust and confidence with their patients, or else patients "may be reluctant to communicate all their thoughts," which renders the treatment "ineffectual."[3] The American Academy of

---

[3] *See, e.g.,* Ellen W. Grabois, *The Liability of Psychotherapists for Breach of Confidentiality,* 12 J.L. & Health 39, 50 (1998).

12

Child and Adolescent Psychiatry, for example, notes that while principles of confidentiality apply across all areas of medicine, they are particularly important when care involves intensely personal subjects such as gender identity that may expose patients to stigma and discrimination.[4] Being able to access a neutral environment where patients can develop a clinically sound basis from which to explore and better understand their own identity can be life-affirming, especially when patients have experienced bias, hostility, and even violence as a result of their identity.[5] Patients who trust that their doctor's office is a place where they can freely discuss "developmentally appropriate issues of gender, sexuality, and mental health concerns within a sensitive and inclusive clinical environment" are better positioned to identify and further their treatment goals.[6]

Physicians cannot function as trusted advisors when patients reasonably perceive that their physician may—at the same time the doctor is providing treatment—be an unwilling source of information for law enforcement. The patient-physician relationship depends on the understanding that physicians are

---

[4] *Practice Parameter on Gay, Lesbian, or Bisexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*, 51 J. of the Am. Acad. of Child & Adolescent Psychiatry 957, 964 (2012).

[5] *Id.*

[6] *See* National Association of Pediatric Nurse Practitioners, *NAPNAP Position Statement on the Care of Lesbian, Gay, Bisexual, Gender Diverse, Transgender, Questioning, Queer, Intersex, Two-Spirit, and Asexual (LGBTQ+) Youth*, 31 J. of Pediatric Health Care 947, 948 (2024).

acting in the patient's interests, and not as instruments through which the government can obtain the patient's most sensitive personal information.

### B. Access to Treatment Depends on Confidentiality, Including Access to Care Beyond the Relationship in Which the Trust was Breached.

The damage to patient trust that comes from disclosure of medical records to the government also creates barriers to accessing care. Patients who believe their medical records are at risk of being scrutinized for improper purposes may lose trust in the medical system's ability or interest in protecting their confidentiality. All twenty national provider organizations participating in the Center for Adolescent Health and the Law's compendium of policy statements about confidentiality have emphasized the relationship between confidentiality and access to health care services.[7]

Requiring physicians to disclose patient records so that law enforcement may investigate or deter lawful medical treatment is a profound breach of trust that undermines the very conditions necessary for effective care. After *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) overturned *Roe v. Wade*, 410 U.S. 113 (1973), researchers documented widespread increases in patient fear that confidential reproductive health information could be accessed by law enforcement

---

[7] *Policy Statements About the Importance of Confidentiality*, Center for Adolescent Health & the Law 1, 8 (Sept. 2005).

404969700.4

or used against them in legal proceedings.[8] Although *Dobbs* did not address government access to records, in states that criminalized abortion, "confidential health information [became] key to successful prosecutions."[9] Once patients perceive physicians as potential conduits for governmental surveillance of their private medical information, patient trust in both individual physicians and health care institutions begins to erode.

Research shows that the loss of trust from perceived government intrusion into medical care has predictable consequences for patient behavior. Breaching patient confidentiality impacts diagnosis and treatment decisions, continuity of care, and public health outcomes. Patients who fear disclosure of sensitive medical records may withhold material information from their physicians or avoid seeking care altogether. Many decline preventive services, forgo screenings, struggle to adhere to treatment plans, and avoid timely follow-up care.[10] Patients may also become less willing to participate in biomedical research when they fear that their

---

[8] *See* Karl Swanson et al., *Effect of Recent Abortion Legislation on Twitter User Engagement, Sentiment, and Expressions of Trust in Clinicians and Privacy of Health Information: Content Analysis*, 25 J. Med. Internet Rsrch. 1, 11 (2023).

[9] Wendy A. Bach & Nicholas Terry, *HIPAA v. Dobbs*, 38 Berkeley Tech. L. J. 609, 659 (2023). *See also id.* at 619 (describing a review of the complete criminal court files for 120 women prosecuted for fetal assault in Tennessee, which found that all but three prosecutions relied on medical records, including conversations between the plaintiff and their medical providers).

[10] *See* Meghna Shukla et al., *Medical Mistrust: A Concept Analysis*, 15 Nurs. Rep. 103, 112–13 (2025).

15

personal health information could be used for purposes unrelated to medical treatment, which can further exacerbate health inequities and stymie medical advancements.[11]

These behavioral changes are not limited to the physician or institution involved in the disclosure. Rather, mistrust generated by disclosure of medical records to law enforcement can spread throughout the entire health care system, affecting patients' willingness to engage with medical institutions more broadly. This chilling effect is heightened for patients receiving politically controversial or stigmatized care, such as reproductive health care, mental health services, or treatment for substance use disorders.[12] Because transgender individuals already experience greater barriers to care than their cisgender peers,[13] confidentiality for young patients seeking gender-affirming care is particularly important.

---

[11] *See* Kate Gallen et al., *Health Effects of Policing in Hospitals: A Narrative Review*, 20 J. Racial & Ethnic H. Disparities 870, 874 (2023).

[12] Congress has recognized that keeping medical records confidential is crucial to patient care through legislation such as 42 U.S.C. § 290dd-2, which pertains specifically to substance use disorder treatment records. *See, e.g., Whyte v. Connecticut Mut. Life Ins. Co.*, 818 F.2d 1005, 1010 (1st Cir. 1987) (finding that "Congress recognized that absolute confidentiality is an indispensable prerequisite to successful alcoholism research. Moreover, confidentiality is necessary to ensure successful alcoholism treatment. Without guarantees of confidentiality, many individuals with alcohol problems would be reluctant to participate fully in alcoholism programs.").

[13] *See, e.g.,* Joshua D. Safer, *Barriers to Health Care for Transgender Individuals*, 23 Current Opinion in Endocrinology, Diabetes & Obesity 168 (Apr. 2016).

404969700.4

Because effective treatment is not possible without trust and candor, damage to the patient-physician relationship can have devastating downstream effects. Medical mistrust is associated with delayed diagnosis and treatment, increased morbidity and mortality, reduced quality of life, and higher health care costs.[14] This mistrust is also associated with greater psychological distress and increased susceptibility to health care misinformation.[15] An individual breach of trust can quickly spread to the health care system as a whole and weaken population-level responses to public health crises.[16]

Courts have therefore recognized that patient confidentiality may be compromised only when the public interest in disclosure outweighs the potential harm to the patient, the patient-physician relationship, and the provision of treatment services. *See United States v. Shinderman*, 432 F. Supp. 2d 149, 155 n.11 (D. Me. 2006), *aff'd*, 515 F.3d 5 (1st Cir. 2008). When there is no public interest or

---

[14] *See* Meghna Shukla et al., *Medical Mistrust: A Concept Analysis*, 15 Nurs. Rep. 103, 112–13 (2025).

[15] *Id.*

[16] For example, in the COVID-19 public health emergency, "trust between a patient and an individual care provider (such as a personal physician) [wa]s highly correlated with COVID-19 vaccine uptake" and "a lack of trust in any or all components of [the health care] system can result in hesitancy and diminished compliance with recommended health practices." Amy Casselman-Hontalas et al., *Discourses of Distrust: How Lack of Trust in the U.S. Health-Care System Shaped COVID-19 Vaccine Hesitancy*, 10 Russell Sage Found. J. Soc. Sci. 154, 159 (2024).

need for the disclosure, as is the case here, the balance decisively favors preserving confidentiality and the patient-physician relationship.

Simply put, the government cannot compel disclosure of sensitive medical records for improper purposes without damaging the trust on which effective medical care depends.[17] Because trust in both physicians and medical institutions, once lost, is difficult to restore, courts should be especially reluctant to permit governmental intrusions that threaten the integrity of the patient-physician relationship.[18] The integrity of the patient-physician relationship is essential to all forms of medical treatment, not just gender-affirming care. Protecting confidentiality protects not only the patients whose records are sought, but also the broader public interest in a health care system that functions in an environment of trust and integrity.

## CONCLUSION

For the foregoing reasons, RIMS respectfully requests that the Court affirm the District Court's order (1) granting the Emergency Motions to Quash, and (2)

---

[17] *See* Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 266 (1994) ("[I]t is critical to maintain a separation between the state and doctor-patient discourse.").

[18] *See, e.g.,* Carly Parnitzke Smith, *First, Do No Harm: Institutional Betrayal and Trust in Health Care Organizations*, 10 J. of Multidisciplinary Healthcare 133 (2017) (discussing the pervasiveness of distrust in health care institutions following a breach of trust).

404969700.4

permanently enjoining the Department of Justice from seeking, receiving, using, retaining, or disseminating any patient-identifying information or protected health information produced by Rhode Island Hospital in response to Administrative Subpoena No. 25-1431-032.

Dated: July 24, 2026

Respectfully submitted,
*/s/ Eric M. Gold*
Eric M. Gold
MANATT, PHELPS & PHILLIPS, LLP
One Beacon Street, 11th Floor
Boston, Massachusetts 02108
(617) 646-1400
EGold@manatt.com

*Counsel for Amicus Curiae*
*Rhode Island Medical Society*

404969700.4

# CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(g)

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B): it contains 4104 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6): it was prepared with Microsoft Word using a proportionally spaced typeface, Times New Roman font size 14.

*/s/ Eric M. Gold*

404969700.4

# CERTIFICATE OF SERVICE

I certify that I have submitted the foregoing document with the Clerk of Court for the United States Court of Appeals for the First Circuit, using the electronic case filing system of the Court. I hereby certify that all parties' counsels are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  July 24, 2026                                    */s/ Eric M. Gold*

404969700.4