# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

In Re: Motion to Quash Administrative Subpoena
to Rhode Island Hospital

Child Advocate for Rhode Island, et al.,

*Petitioners-Appellees,*

v.

United States of America,

*Respondent-Appellant.*

On Appeal from the United States District Court
for the District of Rhode Island

## BRIEF OF *AMICI CURIAE* FORMER DEPARTMENT OF JUSTICE ATTORNEYS IN SUPPORT OF THE PETITIONER-APPELLEE AND AFFIRMANCE

Miriam Rosenbaum
BRENNAN CENTER FOR JUSTICE
  AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, New York 10271
(646) 292-8310
rosenbaumm@brennan.law.nyu.edu

Joseph Gaeta
410 Cole Avenue
Providence, Rhode Island 02906
(646) 292-8310
joe@jgaetaconsulting.com

Austin P. Anderson
Sean P. O'Neill
ANDERSON & KREIGER LLP
50 Milk Street, Floor 21
Boston, MA 02109
(617) 621-6500
aanderson@andersonkreiger.com
soneill@andersonkreiger.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................i

TABLE OF AUTHORITIES.................................................................iii

INTEREST OF *AMICI CURIAE*..............................................................1

INTRODUCTION......................................................................................2

ARGUMENT ..............................................................................................7

I.    DOJ'S IMMENSE POWER MUST BE PROPERLY USED TO ENFORCE FEDERAL LAW. ...........................................................7

II.    DEVIATIONS FROM NORMS AND PROCEDURES IN THIS CASE CREATE AN INFERENCE THAT THAT DOJ IS USING ITS AUTHORITY IMPROPERLY. .............................................13

    A.    Deviations from normal procedures create an inference of improper purpose. ..................................................13

    B.    The President and his appointees have made clear that this investigation is about stopping lawful conduct, rather than enforcing federal law...........................................................15

    C.    This investigation has not been conducted in a manner suggesting its true purpose is enforcing federal law............17

        1. The Subpoenas' timing, thin legal justification, and overbreadth suggest a rush to persecute, rather than methodically prosecute. .................................................17

        2. DOJ's mid-course relocation of its investigation and convening of a grand jury raise additional red flags. ......19

        3. DOJ's approach to publicizing the investigation and subpoenas violate longstanding norms and policies........23

III.    THE INSTITUTIONAL SAFEGUARDS THAT WOULD ONCE HAVE POLICED THE IMPROPER USE OF DOJ AUTHORITY

EVIDENT IN THIS CASE HAVE BEEN CHILLED OR ERODED. ...............................................................................27

CONCLUSION ....................................................................30

CERTIFICATE OF COMPLIANCE.......................................32

CERTIFICATE OF SERVICE............................................33

# TABLE OF AUTHORITIES

**Cases**

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health,*
786 F. Supp. 3d 237 (D. Mass. 2025) ................................................14

*Buckman Co. v. Plaintiffs' Legal Comm.,*
531 U.S. 341 (2001) .............................................................................15

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) .............................................................................14

*Gonzales v. Oregon,*
546 U.S. 243 (2006) .............................................................................15

*In re Admin. Subpoena 25 1431 032 to Rhode Island Hosp.,*
No. CV 1:26-MC-0007-MSM-AEM, 2026 WL 1392565 (D.R.I. May 14,
2026) ........................................................................ 7, 11, 15, 16, 17

*In re Admin. Subpoena No. 25-1431-019,*
800 F. Supp. 3d 229 (D. Mass. 2025) .................................... 16, 24, 26

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action,*
678 F.3d 235 (3d Cir. 2012).................................................................15

*Macone v. Town of Wakefield,*
277 F.3d 1 (1st Cir. 2002)....................................................................14

*Peters v. United States,*
853 F.2d 692 (9th Cir. 1988) ...............................................................10

*QueerDoc, PLLC v. U.S. Dep't of Just.,*
807 F. Supp. 3d 1295 (W.D. Wash. 2025) ................................ 18, 24, 26

*R.H. Stearns Co. of Bos., Mass., v. United States,*
291 U.S. 54 (1934) ...............................................................................13

*Talbott v. United States,*
176 F.4th 720 (D.C. Cir. 2026) ............................................................16

*U.S. Int'l Trade Comm'n v. ASAT, Inc.,*
  411 F.3d 245 (D.C. Cir. 2005)................................................20

*United States v. Colorado Supreme Ct.,*
  189 F.3d 1281 (10th Cir. 1999) ..........................................10

*United States v. Flemmi,*
  245 F.3d 24 (1st Cir. 2001)................................................22

*United States v. Lewis,*
  517 F.3d 20 (1st Cir. 2008)................................................13

*United States v. Skrmetti,*
  605 U.S. 495 (2025) ..........................................................4

*United States v. Williams,*
  504 U.S. 36 (1992) ..........................................................22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ........................................................14

*Wayte v. United States,*
  470 U.S. 598 (1985) ..........................................................2

**Statutes**

18 U.S.C. § 3486(c) ............................................................20

**Other Authorities**

ABA Model Rule 3.1 ............................................................9

ABA Model Rule 3.8(a) ........................................................9

ABA Model Rule 4.4(a) ........................................................9

ABA Model Rule 8.4(d)........................................................10

Ben Penn et al., *Justice Department Expands Gender Care Probe as Hospital Fights*, Bloomberg Law (Aug. 20, 2025)..............17

Brennan Center, *The Department of Justice's Broken Accountability System* (Oct. 20, 2025)........................................................28

Charlie Savage, *Justice Dept.'s Inspector General to Move to the Federal Reserve*, N.Y. Times (June 6, 2025) ..................................................28

Daniel Wiessner, *Justice Department gets quick win in first bid to enforce subpoena on gender-affirming care*, Reuters (May 1, 2026) ...19

Declaration of Paula R. Ramer, Esq., *QueerDoc, PLLC v. U.S. Dep't of Justice*, Case No. 2:25-mc-00042-JNW, ECF No. 1, Ex. 2 (W.D. Wash. July 8, 2025) ......................................................................................19

Dep't of Health & Hum. Servs., *Evidence-Based Care for Children and Adolescents with Gender Dysphoria* 1 (Dec. 18, 2025) ........................18

DOJ Office of the Inspector General, *An Investigation of Alleged Misconduct by Senior DOJ Officials for Leaking Department Investigative Activities Concerning COVID-19 in Nursing Homes to Members of the News Media in October 2020* (Jan. 2025)....................25

FDA, *Understanding Unapproved Use of Approved Drugs "Off Label"* (Feb. 5, 2018) ........................................................................................15

Federal Trade Commission, *The Dangers of "Gender-Affirming Care" for Minors*, Tr. at 49 (July 9, 2025) ........................................................25

Jonah E. Bromwich et al., *White House Secretly Swayed Board Meant to Stop Civil Service Politicization,* N.Y. Times, (June 28, 2026) ...........29

Joseph Goldstein, *N.Y.C. Hospital Is Subpoenaed Over Trans Youth Health Care*, N.Y. Times (May 12, 2026)............................................20

Justice Manual § 1-1.100 ......................................................................9

Justice Manual § 1-4.010 ......................................................................9

Justice Manual § 1-7.100 ....................................................................25

Justice Manual § 1-7.210 ......................................................................9

Justice Manual § 1-7.400(B) ................................................................25

Justice Manual § 1-8.600 ....................................................................12

Justice Manual § 9-11.254 ..................................................................22

Justice Manual § 9-27.001 ....................................................................9

Justice Manual § 9-27.230 ..................................................................11

Memorandum from Brett A. Shumate, Assistant Attorney General, to
All Civil Division Employees, *Civil Division Enforcement Priorities*
(June 11, 2025) ..................................................................................6

Memorandum from Merrick Garland, U.S. Attorney General, to All
Department Personnel, *Department of Justice Communications with
the White House* (July 21, 2021)........................................................12

Memorandum from Pam Bondi, U.S. Attorney General, to All
Department Employees, *General Policy Regarding Zealous Advocacy
on Behalf of the United States* (Feb. 5, 2025) ...................................13

Memorandum from Pam Bondi, U.S. Attorney General, to Select
Component Heads, *Preventing the Mutilation of American Children*
(Apr. 22, 2025) ...........................................................................5, 6, 17

Michael S. Schmidt, et.al., *Depleted and Distracted, Justice Dept. Staff
Fear Losing Focus on Potential Threats*, N.Y. Times, (Jan. 7, 2026)..30

Movement Advancement Project, *Bans on Best Practice Medical Care
for Transgender Youth* (Jan. 22, 2026) ..............................................3

Nancy Kassop, *Contacts Policy Between the White House and the
Department of Justice: A Sleeper Issue - or Maybe Not?*
(July 01, 2022) ..................................................................................12

Nick Bednar, *The Merit System Protection Board's Independence Is
Dead,* Lawfare, (Jan. 20, 2026) ........................................................29

Office of Professional Responsibility, https://www.justice.gov/opr (last
visited July 17, 2026) ........................................................................28

OPR's Role and Relationship to Other Offices and Congress, Office of
Professional Responsibility, U.S. Department of Justice
(June 9, 2026) ...................................................................................27

Orion Rummler, *DOJ, HHS, FTC, FDA: The alphabet soup of efforts to restrict gender-affirming care*, The 19th (July 6, 2026) ......................23

Perry Stein and Jeff Stein, *Trump White House Says It Can Talk to Justice Dept. on Criminal Cases*, Washington Post (Feb. 9, 2025) .....12

Perry Stein et. al., *Several top career officials ousted at Justice Department*, Washington Post (Mar. 7, 2025) ....................................28

Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025) .........6, 24

Robert Jackson, U.S. Attorney General, *The Federal Prosecutor, Address at Second Annual Conference of United States Attorneys*, pp. 4-5 (Apr. 1, 1940) ..................................................................8, 9

Sarah Lynch, *US Justice Department senior career ethics official removed from post, source says*, Reuters (Jan. 27, 2025) ....................28

The White House, *President Trump is Delivering on His Commitment to Protect our Kids* (Feb. 3, 2025) ...........................................................5

The White House, *President Trump Promised to End Child Sexual Mutilation – and He Delivered* (July 25, 2025) .....................................6

Transcript of Teleconference Decision, *Z.A. v. Lucile Salter Packard Children's Hospital at Stanford*, No. 5:26-cv-04998, ECF No. 89 (N.D. Cal. June 26, 2026) ..................................................................23

U.S. Department of Justice, *When Does the Division Announce Investigations?*, Civil Rights Division (Oct. 18, 2018) ........................25

**Rules**

Fed. R. App. P. 29(a)(4)(E) ......................................................................1

Fed. R. Crim. P. 17(c) ............................................................................22

## Regulations

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ........................................................ 4

Office of the Inspector General, 66 Fed. Reg. 37903 (July 20, 2001) ..... 27

*Protecting Children From Chemical and Surgical Mutilation*, Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025) ............................ 4

*Protecting Law Enforcement Officers, Judges, Prosecutors, and Their Families*, Exec. Order No. 13977, 86 Fed. Reg. 6803 (Jan. 18, 2021) . 11

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are former attorneys for the Department of Justice ("DOJ"), serving over seven decades, across administrations of both parties, in Main Justice and United States Attorneys' offices across the country. We have significant experience investigating and prosecuting civil and criminal federal offenses and have deep insight into the institutional norms and procedures that have historically governed DOJ's exercise of law-enforcement authority. We know first-hand how these norms and procedures have supported DOJ's institutional integrity, allowed its attorneys to investigate and prosecute civil and criminal cases ethically and evenhandedly, and helped prevent improper purposes from infecting prosecutorial and civil enforcement decisions.

*Amici* are not medical professionals, and we take no position here on gender-affirming care itself. Nor do we have personal knowledge of how this investigation has been conducted, beyond what the public record

---

[1] Consistent with Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici* and their counsel, has contributed money that was intended to fund preparing or submitting this brief. All parties provided consent for *amici* to file this brief. This brief does not purport to convey the position of New York University School of Law.

discloses. However, what the record appears to show in this case and in related investigations across the country is deeply troubling: the use of DOJ's investigative authority not for a proper purpose, but to compel substantive policy change through intimidation, coercion, and retribution.

That is anathema to the norms, practices, and procedures that governed DOJ's operations for generations up until recently. In our experience and judgment, these striking deviations from procedural norms support the District Court's finding that the challenged subpoena was issued for an improper purpose.

## INTRODUCTION

In our decades of experience, we have investigated cases, prosecuted crimes in court, and defended the federal government's arguments and conduct. We appreciate DOJ's power, and we know how it can be abused. "[A]lthough prosecutorial discretion is broad, it is not unfettered." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (cleaned up). It has long been recognized that vindictive prosecutions can be abusive and violate a defendant's rights. *Id.*

No less problematic is the use of coercive investigations to punish disfavored groups or individuals. We understand a coercive investigation to be the use of an investigatory tool—here, an administrative subpoena—for a purpose unauthorized by law and unrelated to the law authorizing the investigation. Such an investigation can be "vindictive" in the classic sense—used as a means of retribution against a perceived enemy—or as a tool for coercion, to achieve a change in conduct which the law would not otherwise empower the government to compel. Unlike prosecutions, which largely take place in the public eye and with the ultimate backstop of a judge and jury, the coercive investigation can achieve its goal of harming a person or forcing the abandonment of lawful conduct without ever becoming public or being tested in court.

The current Administration has made it the declared policy of the federal government to stamp out gender-affirming care nationwide, notwithstanding the fact that this care is lawful in Rhode Island, 22 other states, and the District of Columbia.[2] Indeed, the Supreme Court has recently affirmed that states have "wide discretion to pass legislation,"

---

[2] R.I. Gen. Laws § 23-101-2; Movement Advancement Project, *Bans on Best Practice Medical Care for Transgender Youth* (Jan. 22, 2026), https://tinyurl.com/y42n7mh2.

pro or con, in this area. *United States v. Skrmetti*, 605 U.S. 495, 524 (2025). What it cannot achieve under existing law, this Administration seeks to do with a coercive investigation.

On January 20, 2025, President Trump issued EO 14168, stating: "It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."[3] On January 28, 2025, he issued EO 14187, providing in part: "[I]t is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures." The EO proclaims that—lawful or not—such treatments "must end."[4] One week later, the White House reiterated that the EO's

---

[3] *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[4] *Protecting Children From Chemical and Surgical Mutilation*, Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).

"intended effect" was "to downsize or eliminate . . . so-called gender affirming care programs."[5]

On April 22, 2025, then-Attorney General Pam Bondi issued a memorandum ("Bondi Mem.") directing DOJ to implement the President's EO.[6] In relevant part, it ordered "all Department of Justice employees to . . . hold accountable those who prey on vulnerable children and their parents." Bondi Mem. at 3.

Specifically, the Attorney General directed "the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act (FDCA) by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of [medications] used to facilitate a child's so-called 'gender transition.'" *Id*. at 4. And she directed "the Civil Division's Fraud Section to pursue investigations under the False Claims

---

[5] The White House, *President Trump is Delivering on His Commitment to Protect our Kids* (Feb. 3, 2025), https://tinyurl.com/mrxvewkc.

[6] Memorandum from Pam Bondi, U.S. Attorney General, to Select Component Heads, *Preventing the Mutilation of American Children* (Apr. 22, 2025), https://tinyurl.com/yzyx4akh.

Act (FCA) of false claims submitted to federal health care programs for any noncovered services related to radical gender experimentation." *Id.*

On June 11, 2025, Brett Shumate was sworn in as Assistant Attorney General for DOJ's Civil Division and issued his own directive to pursue investigations of "manufacturers and distributors" of drugs used in gender-affirming care for illegal promotion in violation of the FDCA, and investigations of "false claims submitted to federal health care programs" in violation of the FCA.[7] Mr. Shumate also signed the Rhode Island Hospital ("RIH") Subpoena and more than twenty other materially identical subpoenas under the authority of 18 U.S.C. § 3486 (collectively, the "HIPAA Subpoenas").[8] The Administration later boasted that, as a result of its actions, a dozen or so hospitals had "stopped," "ended," "halted," or "suspended" gender-affirming care for minors.[9]

---

[7] Memorandum from Brett A. Shumate, Assistant Attorney General, to All Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://tinyurl.com/3vrdw8ed.

[8] Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://tinyurl.com/yzjpurhy ("DOJ July 2025 Subpoena").

[9] The White House, *President Trump Promised to End Child Sexual Mutilation – and He Delivered* (July 25, 2025), https://tinyurl.com/7eppf39d (emphasis in original).

In *amici's* view, the record appears to indicate that the subpoena at issue (the "RIH Subpoena") was a coercive one.  The deviations from longstanding DOJ norms and procedures that we discuss below reinforce the District Court's finding that the subpoena was "issued for an improper purpose" as part of a "coercive investigation" attempting to force RIH to stop providing gender-affirming care patients from seeking legal health care that this Administration has announced its desire to "end."  *In re Admin. Subpoena 25 1431 032 to Rhode Island Hosp.*, No. CV 1:26-MC-0007-MSM-AEM, 2026 WL 1392565, at *8 (D.R.I. May 14, 2026) (hereafter "Op.").

*Amici* believe that the use of a DOJ investigation for these purposes is dangerous and wrong and that failing to stop it could encourage more vindictive or coercive investigations to come.  This Court has an important role to play in preventing such abuses.

## ARGUMENT

### I. DOJ'S IMMENSE POWER MUST BE PROPERLY USED TO ENFORCE FEDERAL LAW.

Federal prosecutors enforce laws passed by Congress.  Those laws define illegal conduct and provide prosecutors the tools they need to investigate that illegal conduct and prove their cases in court.  No

member of the executive branch has license to decide what conduct they believe is wrong; nor do they have unfettered authority to obtain evidence or testimony from targets or others.

The responsibility of a federal prosecutor was most famously set forth by Justice Robert Jackson in a speech that still appears on DOJ's website:

> With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone. In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.
>
> ***It is in this realm – in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies.***[10]

Crucially, it is improper to "pick[] the man and then . . . put[] investigators to work . . . to pin some offense on him," even if the government is motivated not by animus, but by the desire to achieve

---

[10] Robert Jackson, U.S. Attorney General, *The Federal Prosecutor, Address at Second Annual Conference of United States Attorneys*, pp. 4-5 (Apr. 1, 1940), https://tinyurl.com/bdfbwhkw (emphasis and line breaks added).

substantive policy goals. *Id.* The key point of Justice Jackson's teaching is that investigation and prosecution should flow from a reasonable, concrete suspicion that someone has violated the law.

DOJ procedures and ethical rules have worked together to constrain this power toward authorized ends. The Justice Manual[11] includes hundreds of pages of guidance on everything from contacts with the media to the necessary consultations before proceeding with different types of charges. *See, e.g.*, JM § 1-7.210. Criminal prosecutors also operate with the Principles of Federal Prosecution, which "promote the reasoned exercise of prosecutorial authority and contribute to the fair, evenhanded administration of the federal criminal laws," in the background of their decision-making. *Id.* § 9-27.001. These Principles reflect the ethical duties prosecutors must obey,[12] consistent with their professional licensure and role as officers of the court. *Id.* § 1-4.010.

---

[11] The Justice Manual "publicly sets forth internal DOJ policies and procedures." Justice Manual § 1-1.100 (hereafter "JM").

[12] *See, e.g.*, ABA Model Rule 3.1 (prohibiting a lawyer from bringing a proceeding "unless there is a basis in law and fact for doing so that is not frivolous"); ABA Model Rule 3.8(a) (requiring a lawyer to "refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause"); ABA Model Rule 4.4(a) ("a lawyer shall not [take actions] that have no substantial purpose other than to embarrass, delay,

Even initial steps of a federal criminal prosecution entail the use of legal process covered by rules of professional ethics. *See, e.g., United States v. Colorado Supreme Ct.*, 189 F.3d 1281, 1288-89 (10th Cir. 1999). As such, it is improper to use "[a]n administrative subpoena" to conduct a "fishing expedition"—just as it is improper to bring a court proceeding that is not well-founded in fact or law. *Peters v. United States*, 853 F.2d 692, 700 (9th Cir. 1988).

Each of us has practiced under these principles and ethical rules. We may not have agreed with what each one of them required of us in every situation, but we recognize the invaluable role they play in constraining the awesome power of federal prosecutors and safeguarding against its abuse.

On appeal, the Government protests that the District Court effectively held that any industry or practice that an administration is opposed to as a policy matter would be immunized from investigation. Gov't Br. at 40. Nothing in the District Court's decision prevents the President from setting DOJ's enforcement priorities. Career DOJ

---

or burden a third person"); ABA Model Rule 8.4(d) ("professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice").

attorneys have faithfully advanced the policy directives of administrations of both parties throughout history.[13] Indeed, the Principles of Federal Prosecution recognize "[t]he fact that a particular prosecution is part of a larger federal law enforcement initiative that serves a substantial federal interest is an appropriate and relevant consideration in determining whether that individual prosecution also serves such a federal interest."[14]

Contrary to what the Government argues here, the District Court did not conclude that White House policy initiatives and the work of a federal prosecutor may not align. Rather, the District Court concluded nothing more than that investigations "require a genuine legitimate investigative purpose," irrespective of policy purposes. Op., 2026 WL 1392565, at *8. While there may be some reasonable debate about how much direction DOJ should receive from the White House, this case

---

[13] *See, e.g.*, *Protecting Law Enforcement Officers, Judges, Prosecutors, and Their Families*, Exec. Order No. 13977, 86 Fed. Reg. 6803 (Jan. 18, 2021) ("The Attorney General shall prioritize the investigation and prosecution of Federal crimes involving actual or threatened violence against judges, prosecutors, or law enforcement officers or their family members….").

[14] JM § 9-27.230 comment 1.

11

represents an extreme. Here, the White House and DOJ's political leadership have directed DOJ to "hold accountable" an entire field or industry engaged in lawful conduct by seeking out criminal violations perpetrated by its members.

Longstanding conventions would historically have prevented this sort of direction, and our ethical obligations would have obliged us to reject that direction if received. Since the 1990s, written policies limited contacts between the White House and DOJ on specific matters.[15] Those policies protected prosecutors' ability to independently assess the merits of any case and take steps consistent with their ethical responsibilities.

But the firewall between the White House and DOJ prosecutors on most specific matters has been eliminated by this Administration.[16] On the day she was sworn in as Attorney General, Bondi described DOJ's

---

[15] *See* Memorandum from Merrick Garland, U.S. Attorney General, to All Department Personnel, *Department of Justice Communications with the White House* (July 21, 2021), https://tinyurl.com/2s488wtn; *see also* Nancy Kassop, *Contacts Policy Between the White House and the Department of Justice: A Sleeper Issue - or Maybe Not?* (July 01, 2022), available at https://tinyurl.com/bzsyk928; see also JM § 1-8.600.

[16] Perry Stein and Jeff Stein, *Trump White House Says It Can Talk to Justice Dept. on Criminal Cases*, Washington Post (Feb. 9, 2025), https://tinyurl.com/47b2xkeu.

employees as "the *President['s]* . . . lawyers."[17]  DOJ lawyers today face the unprecedented threat of termination if they do not "zealously" prosecute the President's ideological agenda.[18]  Extreme cases like this show what can happen when prosecutorial independence is compromised and the safeguards that have historically addressed the improper influences on Department investigations are removed.

## II. DEVIATIONS FROM NORMS AND PROCEDURES IN THIS CASE CREATE AN INFERENCE THAT THAT DOJ IS USING ITS AUTHORITY IMPROPERLY.

### A. Deviations from normal procedures create an inference of improper purpose.

*Amici* agree that DOJ's decisions and actions should be presumed to have been made in good faith and following regular procedures.  *See United States v. Lewis*, 517 F.3d 20, 25 (1st Cir. 2008).  There is "[n]o doubt," however, that this "presumption of regularity is subject to be rebutted."  *R.H. Stearns Co. of Bos., Mass., v. United States*, 291 U.S. 54, 63 (1934).

---

[17] Memorandum from Pam Bondi, U.S. Attorney General, to All Department Employees, *General Policy Regarding Zealous Advocacy on Behalf of the United States* (Feb. 5, 2025), https://tinyurl.com/3sw29mt5 (emphasis added).

[18] *Id.*

Among other things, the presumption does not shield government action when the Court is presented with "an explanation for [that] action [that] is incongruent with what the [public] record reveals about the agency's priorities and decisionmaking process." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 786 F. Supp. 3d 237, 255 (D. Mass. 2025) (citing *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)). And where there is a "strong showing of bad faith or improper behavior," the Court "is not required to ignore the disconnect between the decision made and the explanation given." *Id.*

Deviations from procedures and norms can be compelling evidence that a presumption of good faith and regularity is unwarranted. As the Supreme Court has recognized, "[t]he specific sequence of events leading up to the challenged decision," and any "[d]epartures from the normal procedural sequence," can be strong "circumstantial . . . evidence" of improper "intent." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977). This Court has used this analysis to assess improper motive. *See Macone v. Town of Wakefield*, 277 F.3d 1, 6 (1st Cir. 2002) ("procedural abnormalities can provide a basis for finding discriminatory intent").

14

The sequence of events leading up to the RIH Subpoena and DOJ's many departures from its own norms and procedures—the "discrepancy between the honorable conduct expected of federal prosecutors and DOJ's tactics in this case"—in this nationwide investigation support the District Court's findings that any presumption has been rebutted.  Op., 2026 WL 1392565, at *10.

**B. The President and his appointees have made clear that this investigation is about stopping lawful conduct, rather than enforcing federal law.**

The "medical profession" has long been "regulated" primarily "under the States' police powers," not federal law.  *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006).  Relevant here, "the [Federal Food, Drug, and Cosmetic Act] does not regulate the practice of medicine." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir. 2012).  Thus, "once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient."[19]

---

[19] FDA, *Understanding Unapproved Use of Approved Drugs "Off Label"* (Feb. 5, 2018), https://tinyurl.com/2m56uxm2; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 & n.5 (2001).

Despite these well-settled legal principles, this Administration has expressly declared that it is now the official policy of the United States to "end" a form of legal medical care. The government's multi-pronged effort has been characterized as an "unadulterated expression of animus and reflective of a bare desire to harm a politically unpopular group." *Talbott v. United States*, 176 F.4th 720, 728 (D.C. Cir. 2026) (internal citations omitted).

Along those lines, the District Court here concluded the purpose of the subpoena, as evidenced by "DOJ's own public record" is to effectuate the policy goals of the Administration that "has publicly characterized gender-affirming care for minors as abuse, directed the DOJ to bring its practice to an end, and celebrated when hospitals curtailed such programs as a result of this subpoena campaign." Op., 2026 WL 1392565, at *8. Other District Courts assessing similar subpoenas have not been able to avoid the conclusion that the purpose of the subpoenas ""is to interfere with the [states'] right to protect [gender-affirming care] within its borders, to harass and intimidate [hospitals] to stop providing such care, and to dissuade patients from seeking such care." *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025).

16

Based on our understanding of the public record, we agree the "DOJ has proven unworthy" of "trust at every point in this case" concerning a subpoena issued for an improper purpose in bad faith." Op., 2026 WL 1392565, at *1, *8.

## C. This investigation has not been conducted in a manner suggesting its true purpose is enforcing federal law.

### 1. The Subpoenas' timing, thin legal justification, and overbreadth suggest a rush to persecute, rather than methodically prosecute.

The record of this case, and the other investigations like it, indicates the process DOJ followed in issuing the RIH Subpoena was not undertaken with the kind of deliberate plan that DOJ norms and ethical rules demand. The Attorney General directed investigations, Bondi Mem. at 4, and the RIH Subpoena and other HIPAA Subpoenas followed. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 569 (E.D. Pa. 2025).[20]

---

[20] It has been reported that Mr. Shumate's predecessor, Amanda Liskamm, "declined to sign" the Subpoenas opining "that investigating providers and doctors for prescribing [gender-affirming therapy] would be unlikely to lead to a successful criminal prosecution." Liskamm and her deputy subsequently resigned. Ben Penn et al., *Justice Department Expands Gender Care Probe as Hospital Fights*, Bloomberg Law (Aug. 20, 2025), https://tinyurl.com/yn8p8rxf.

As several courts, including the District Court here, granted motions to quash these subpoenas, DOJ was forced to file supplemental declarations and take other procedural steps to salvage their investigation. *See, e.g.*, *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 581. Many of those courts concluded these shifting and *post hoc* explanations were further evidence of the Department's improper purpose. *Id.* at 607, *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1303 (W.D. Wash. 2025). The Department's *post hoc* justifications have continued on appeal: in this case it cites as justification for one of its theories a document that was issued by the Department of Health and Human Services six months after its investigation began.[21]

*Amici* do not claim to know what other evidence the Government may have, or whether there is some other legal theory that may justify its actions. However, we *can* say that as of now—over a year after the HIPAA Subpoenas were issued, and after many opportunities to defend its conduct and explain its theory—the Government has failed to provide

---

[21] *See* Dep't of Health & Hum. Servs., *Evidence-Based Care for Children and Adolescents with Gender Dysphoria* 1 (Dec. 18, 2025), https://perma.cc/ZH22-R5GH

any credible explanation for its conduct that is consistent with a legitimate investigatory motive. This kind of conduct is far outside the traditions and norms of the Department.

### 2. DOJ's mid-course relocation of its investigation and convening of a grand jury raise additional red flags.

Until recently, all evidence suggested DOJ's investigation was headquartered out of Main Justice in Washington, D.C. Subpoenas were signed by DOJ attorneys based in Washington D.C.[22] Counsel for targets of these subpoenas interacted with attorneys located in Washington D.C.[23]

Nearly a year into this investigation, DOJ has switched its tactics considerably. In addition to DOJ's filing in the Northern District of Texas to enforce a subpoena against Rhode Island Hospital, that same month a hospital in New York City publicly disclosed that it had received a

---

[22] Daniel Wiessner, *Justice Department gets quick win in first bid to enforce subpoena on gender-affirming care*, Reuters (May 1, 2026), https://tinyurl.com/35ctr6jk ("The subpoena, was signed by Shumate, who is based in the District of Columbia, and refers to three other Washington-based department lawyers.").

[23] *QueerDoc, PLLC v. U.S. Dep't of Justice*, Case No. 2:25-mc-00042-JNW, Declaration of Paula R. Ramer, Esq., ECF No. 1, Ex. 2, at 2:5-8 (W.D. Wash. July 8, 2025).

subpoena from a grand jury convened in the Northern District of Texas.[24]

These developments—DOJ's "obvious effort to shield its recent investigations" by filing in "a distant forum that DOJ deems friendly to its political positions"—raise an inference of improper purpose relevant to this case in at least two ways.

First, moving to enforce an administrative subpoena in Texas for an investigation that by all accounts had been headquartered in Washington D.C. is unusual. "[T]he Attorney General may invoke the aid of any court of the United States within the jurisdiction of which the investigation is carried on or of which the subpoenaed person is an inhabitant, or in which he carries on business or may be found, to compel compliance with the subpoena." 18 U.S.C. § 3486(c). If there is any doubt as to the jurisdiction where the investigation is being "carried on," case law provides clear guidance to look to the location where "the hub" of national investigative activity took place. *See U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 249 (D.C. Cir. 2005).

---

[24] Joseph Goldstein, *N.Y.C. Hospital Is Subpoenaed Over Trans Youth Health Care*, N.Y. Times (May 12, 2026), https://tinyurl.com/4cn88tfb.

All the indicia in this case indicate that the "hub" of this investigation was in Washington, D.C.  This makes sense: a purportedly nationwide investigation of health care providers under the FDCA or FCA would likely be led by experts located in the Civil or Criminal Divisions at Main Justice, or undertaken with Main Justice's active assistance by a United States Attorney's Office that initiated the investigation or has special expertise.  In our experience, it would not be normal practice to relocate a nationwide investigation to a United States Attorney's Office.  More unusual still is that the decision to relocate appears to have been made after nearly a year's worth of work had been completed by Main Justice attorneys.  There can be valid reasons for relocating an investigation as it progresses, like the need for additional resources or expertise, but those reasons typically counsel moving an investigation to, not away from, Main Justice in Washington.

Second, those of us who have investigated criminal matters find it questionable that DOJ appears to have turned to general-purpose grand jury subpoenas to obtain information courts refused the allow the Department to obtain with limited-purpose, HIPAA administrative subpoenas.

21

A grand jury may issue subpoenas to "investigate merely on suspicion that the law is being violated, or even because it wants assurance that it is not." *United States v. Williams*, 504 U.S. 36, 48 (1992). Even with that low threshold, a "court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c). "Courts afford grand jury proceedings a presumption of regularity," but "prosecutors do not have carte blanche in grand jury matters." *United States v. Flemmi*, 245 F.3d 24, 28 (1st Cir. 2001) (observing the longstanding rule prohibiting the use of grand jury subpoenas for trial preparation). DOJ rules and practices encourage prudence using grand jury subpoenas when other fact-gathering tools are available. *See, e.g.*, JM § 9-11.254 ("Before issuing a grand jury subpoena, prosecutors should consider what evidence has already been collected…and whether…other compulsory process is available to obtain the information sought.").

It appears that DOJ opened a grand jury investigation only after at least eight district courts concluded that DOJ's nationwide investigation was not grounded in a good faith belief that a federal health care offense

may have been committed.[25]  "Other compulsory process"—the HIPAA subpoenas—was indeed available, but the Department repeatedly failed to show that its purpose for using this process was proper.  If it is true that the Department convened a grand jury in Texas to circumvent adverse judicial decisions elsewhere in the country, *amici* would consider that conduct to be a paradigmatic example of Justice Jackson's warning about "picking the man and then searching the law books, or putting investigators to work, to pin some offense on him."[26]

### 3. DOJ's approach to publicizing the investigation and subpoenas violate longstanding norms and policies.

DOJ's efforts to publicize its investigation are contrary to prosecutorial best practices, Department rules, and attorney ethical responsibilities.

---

[25] Orion Rummler, *DOJ, HHS, FTC, FDA: The alphabet soup of efforts to restrict gender-affirming care*, The 19th (July 6, 2026), https://tinyurl.com/j7sn23d5.

[26] *See Z.A. v. Lucile Salter Packard Children's Hospital at Stanford*, No. 5:26-cv-04998, Transcript of Teleconference Decision, ECF No. 89 at 11:6-11(N.D. Cal. June 26, 2026)  ("[T]his Court will not blind itself to reality. And, in this case, reality is the timeline of DOJ's efforts and, in particular, its efforts to recast discredited civil administrative subpoenas as grand jury subpoenas from a hand-picked faraway jurisdiction in order to minimize judicial review of constitutional infirmities.").

Amidst hospital efforts to seal court proceedings in connection with DOJ's investigation, *see In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 234, DOJ issued what one District Court rightly called an "inflammatory" press release "attempting to sway public sentiment against healthcare providers." *QueerDoc*, 807 F. Supp. 3d at 1301. The press release said *explicitly* that DOJ was seeking to hold hospitals "accountable" for purportedly "mutilat[ing] children in the service of a warped ideology"—*i.e.*, for providing gender-affirming care *per se*.[27] There was not a word in the press release about unlawful promotion of pharmaceuticals in violation of the FDCA—the ostensible focus of the investigation.

On that same day, Department officials publicly discussed the Department's investigation at a Federal Trade Commission conference entitled "The Dangers of 'Gender-Affirming Care' for Minors." There, moments after mentioning the Subpoenas, DOJ Chief of Staff Chad Mizelle openly stated that DOJ's goal was to "*take down this ... industry*"

---

[27] *See* DOJ July 2025 Subpoena.

(*i.e.*, gender-affirming care), and that "[w]e are using all of the tools at the Department of Justice to address this issue."[28]

It was not just the content of these remarks that is extraordinary; it is extraordinary that the Government said anything at all. The Department "generally will not confirm the existence of or otherwise comment about ongoing investigation."[29] JM § 1-7.400(B). DOJ attorneys are counseled that "disclosure of [non-public, sensitive information] to anyone . . . is prohibited and could lead to disciplinary action," including "criminal prosecution or administrative action." *Id.* § 1-7.100.[30]

---

[28] Federal Trade Commission, *The Dangers of "Gender-Affirming Care" for Minors*, Tr. at 49 (July 9, 2025), https://tinyurl.com/4a9rc7bx (emphasis added).

[29] DOJ has articulated a limited exception to that rule, not relevant here, that has applied to civil rights investigations of law enforcement agencies, prisons and jails. U.S. Department of Justice, *When Does the Division Announce Investigations?*, Civil Rights Division (Oct. 18, 2018), https://tinyurl.com/3dynfjtw.

[30] DOJ's Office of Inspector General concluded that the Department violated its own rules by issuing a press release announcing information requests related to nursing-home care during the COVID pandemic. DOJ Office of the Inspector General, *An Investigation of Alleged Misconduct by Senior DOJ Officials for Leaking Department Investigative Activities Concerning COVID-19 in Nursing Homes to Members of the News Media in October 2020* (Jan. 2025) at 42-44, https://tinyurl.com/nhzr94kj.

It is true that HIPAA does not expressly *require* confidentiality. But as a matter of common sense and longstanding DOJ practice, *amici* fail to see what law-enforcement purpose is served by announcing a wide-ranging criminal investigation well before an indictment has been filed or any obviously criminal conduct has been identified. A prosecutor's job is harder, not easier, when investigations become public in their early stages, putting potential targets and witnesses on notice and risking the destruction or alteration of necessary evidence.

Just as extraordinarily, despite these internal rules, ethical responsibilities, and best prosecutorial practices, DOJ has opposed hospital efforts to seal court proceedings. *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 234-35.[31] Once again, in our experience it is highly unusual for DOJ to seek publicity of a sensitive criminal investigation in its early fact-gathering stage—and to be so insistent on doing so that it would oppose a sealing motion, at the risk of having its own nascent investigation dissected in open court.

---

[31] Other district courts have concluded similarly. *See, e.g., QueerDoc,* 807 F. Supp. 3d at 1301 ("this troubling behavior by DOJ actually strengthens the case for transparency, not secrecy.").

## III. THE INSTITUTIONAL SAFEGUARDS THAT WOULD ONCE HAVE POLICED THE IMPROPER USE OF DOJ AUTHORITY EVIDENT IN THIS CASE HAVE BEEN CHILLED OR ERODED.

Over many decades, numerous institutional safeguards have protected the Department's decisions from improper influence and supported a presumption of regularity in DOJ's work. Those safeguards cannot be relied upon today by the courts.

The Department's Office of Professional Responsibility investigates allegations of professional misconduct by DOJ attorneys in court and related to litigation.[32] The Office of Inspector General is an independent, nonpartisan office housed within the Department charged with detecting and preventing waste, fraud, and abuse.[33] These offices once provided an independent assessment of cases and conduct outside the chain of command, conducting fact-finding and setting precedents that deterred improper actions and guided the conduct of all DOJ attorneys. This Administration has undermined the work of these offices through

---

[32] OPR's Role and Relationship to Other Offices and Congress, Office of Professional Responsibility, U.S. Department of Justice (June 9, 2026), https://tinyurl.com/4yzzk7cc.

[33] Office of the Inspector General, 66 Fed. Reg. 37903 (July 20, 2001), https://tinyurl.com/vcxa465w.

terminations, demotions, and reassignments.[34]  In the first weeks of this Administration, DOJ's political appointees ousted several key senior career officials, including the head of the Office of Professional Responsibility,[35] and the Associate Deputy Attorney General who was responsible for making ethics determinations involving high-level DOJ officials, including those relating to partiality and improper political influence.[36]  DOJ's Inspector General left his role in June 2025, after 13 years of service, following the firing or demotion of 20 inspectors general across the government.[37]

---

[34] Brennan Center, *The Department of Justice's Broken Accountability System* (Oct. 20, 2025), https://tinyurl.com/3p6twp9t.

[35] Perry Stein et. al., *Several top career officials ousted at Justice Department*, Washington Post (Mar. 7, 2025), https://tinyurl.com/d4cydx4y.

[36] Sarah Lynch, *US Justice Department senior career ethics official removed from post, source says*, Reuters (Jan. 27, 2025), https://tinyurl.com/nhkxh9t4.

[37] Charlie Savage, *Justice Dept.'s Inspector General to Move to the Federal Reserve*, N.Y. Times (June 6, 2025), https://tinyurl.com/3tj2eps3.  The Senate confirmed a new Inspector General for DOJ this month, over a year after the last Senate-confirmed IG departed. https://tinyurl.com/5ebrs92z.  DOJ's website does not list a new head of OPR.  Office of Pro. Resp., https://www.justice.gov/opr (last visited July 17, 2026).

Meanwhile, this Administration has eroded civil-service and whistleblower protections enforced by agencies outside the Department. Independent agencies like the Merit Systems Protection Board and the Office of Special Counsel have protected career DOJ attorneys from prohibited personnel practices, such as whistleblower retaliation, discrimination based on political affiliation, and politicized employment decisions. Terminations of the prior leadership of these agencies and efforts to limit their jurisdiction cast serious doubt on whether DOJ attorneys can rely upon them if they resist improper influences or become whistleblowers.[38]

In addition to these formal guardrails, career DOJ prosecutors bring decades of experience and judgment to any new investigation. The exodus of career attorneys from DOJ in the past year has devastated the Department's institutional judgment and removed perhaps the most

---

[38] *See generally* Jonah E. Bromwich et al., *White House Secretly Swayed Board Meant to Stop Civil Service Politicization,* N.Y. Times, (June 28, 2026), https://tinyurl.com/32bk3ca4; Nick Bednar, *The Merit System Protection Board's Independence Is Dead,* Lawfare, (Jan. 20, 2026), https://tinyurl.com/36fecj2m.

important checks against abuse in cases like this one.[39]  And if there were any doubt that DOJ is seeking to protect its attorneys from any institutional or independent accountability for their actions, it has proposed a rule that would give it the ability to indefinitely block a state bar association from investigating any DOJ attorney accused of misconduct.

The RIH Subpoena has been issued at a time when DOJ offices and other oversight agencies responsible for policing the Department are unlikely or unwilling to do so.  For that reason, judicial review of the Department's intent and purpose has never been more necessary.

## CONCLUSION

In *amici*'s view, the record in this case is sufficient to overcome any presumption of regularity that might otherwise attach to DOJ's actions, and to support the conclusion that the RIH Subpoena was issued for improper purposes.  *Amici* urge the Court to affirm.

---

[39] Michael S. Schmidt, et.al., *Depleted and Distracted, Justice Dept. Staff Fear Losing Focus on Potential Threats*, N.Y. Times, (Jan. 7, 2026), https://tinyurl.com/5ff5keyy.

Respectfully submitted,

*/s/ Austin P. Anderson*

Austin P. Anderson
Sean P. O'Neill
ANDERSON & KREIGER LLP
50 Milk Street, Floor 21
Boston, MA 02109
(617) 621-6500
aanderson@andersonkreiger.com
soneill@andersonkreiger.com

Miriam Rosenbaum
BRENNAN CENTER FOR JUSTICE
   AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, New York 10271
(646) 292-8310
rosenbaumm@brennan.law.nyu.edu

Joseph Gaeta
410 Cole Avenue
Providence, Rhode Island 02906
(646) 292-8310
joe@jgaetaconsulting.com
July 24, 2026                              *Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because the brief contains 5,879 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

July 24, 2026                    */s/ Austin P. Anderson*
                                 Austin P. Anderson

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on July 24, 2026.

I hereby certify that participants in the case are represented by registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

July 24, 2026
/s/ Austin P. Anderson
Austin P. Anderson

# APPENDIX

1.) Carmen Ortiz, United States Attorney for the District of Massachusetts (2009-17)

2.) Barry Grissom, United States Attorney for the District of Kansas (2010-2017)

3.) Bill Killian, United States Attorney for the Eastern District of Tennessee (2010-2015)

4.) Wendy Olson, United States Attorney for the District of Idaho (2010-2017); Assistant U.S. Attorney (1997-2010), U.S. Attorney's Office for the District of Idaho; Trial Attorney, Criminal Section, Civil Rights Division (1992-1997)

5.) John Vaudreuil, United States Attorney (2010-17), Assistant United States Attorney (1980-2010), U.S. Attorney's Office for the Western District of Wisconsin

6.) Larry Patton, United States Attorney for the Western District of Oklahoma (1978-81)

7.) Jim Lewis, United States Attorney for the Central District of Illinois (2010-16)

8.) Michael Cotter, United States Attorney for the District of Montana (2009-17)

9.) Anne Tompkins, United States Attorney for the Western District of North Carolina (2010-25)

10.) Lon Povich, Assistant U.S. Attorney (1990-93), U.S. Attorney's Office for the District of Massachusetts

11.) David Mackey, Assistant U.S. Attorney (1994-2001), U.S. Attorney's Office for the District of Massachusetts

12.) Jennifer Serafyn, Assistant U.S. Attorney (2008-25), U.S. Attorney's Office for the District of Massachusetts

13.) Sara Winslow, Chief of the Civil Division (2016-21), Civil Health Care Fraud Coordinator (2002-16), Assistant U.S. Attorney (2002-16), Affirmative Civil Enforcement Coordinator, U.S. Attorney's Office for the Northern District of California;

Trial Attorney, U.S. Department of Justice, Civil Fraud Section (1996–2001)

14.) Mildred Methvin, U. S. Magistrate Judge (1983-2009), Assistant U. S. Attorney (1979-1981), Western District of Louisiana

15.) Brendan Ballou, Special Counsel (2023-25) and Trial Attorney (2020-23), Antitrust Division

16.) Roland Riopelle, Assistant U.S. Attorney, U.S. Attorney's Office for the Southern District of New York (1991-98)

17.) Joyce Branda, Acting Assistant Attorney General (Sept. 2015-Feb. 2016) and Deputy Assistant Attorney General (2012-2017), Civil Division; Trial Attorney, Assistant Director, Deputy Director, and Director (1982-2012) Fraud Section, Commercial Litigation Branch, Civil Division; Trial Attorney (1980-82), Land and Natural Resources Division

18.) Ellyn Lindsay, Assistant U.S. Attorney (1987–2015) and DOJ Honors Program Graduate (1985–87), U.S. Attorney's Office for the Central District of California

19.) John Warshawsky, Senior Trial Counsel and Trial Attorney (1990-2008 and 2010-2014), Civil Division

20.) Ty Cobb, Special White House Counsel (2017-18); Senior Trial Counsel, Office of the Independent Counsel, HUD (1992-93); Assistant U.S. Attorney (1980-86), Chief of the Criminal Division (1983-86), Mid-Atlantic Regional Coordinator President's Organized Crime Drug Enforcement Task Force (1983-86), U.S. Attorney's Office for the District of Maryland

21.) Ira Belkin, Assistant U.S. Attorney (1990-2002), U.S. Attorney's Office for the District of Rhode Island

22.) Jeffrey Hansen, Assistant U.S. Attorney (2010-18), U.S. Attorney's Office for the Northern District of Illinois

23.) Alan Rose, Assistant U.S. Attorney (1975-90), U.S. Attorney's Office for the District of Massachusetts

24.) Charles Work, Deputy Administrator, Law Enforcement Assistance Administration (1973-75); Assistant U.S. Attorney (1966-73), U.S. Attorney's Office for the District of Columbia,

25.) Julia Caroff, Assistant U.S Attorney (1989 - 2015), U.S Attorney's Office for the Eastern District of Michigan

26.) Roger Haines, Assistant U.S. Attorney (1978-2007), U.S. Attorney's Office for the Southern District of California

27.) Alan Gershel, Deputy Assistant Attorney General, U.S. Department of Justice (1999); Interim U.S. Attorney (1989-1990, 2001), Assistant U.S. Attorney (1980-2008), and Criminal Chief (1989-2008), U.S. Attorney's Office for the Eastern District of Michigan

28.) Mary Catherine Frye, Civil Chief (1994-2003), U.S. Attorney's Office for the Middle District of Pennsylvania; Senior Litigation Counsel and Deputy Chief, Affirmative Litigation (2003-15), U.S. Attorney's Office for the Eastern District of Pennsylvania

29.) Ben Clements, Assistant U.S. Attorney (1994-2001), U.S. Attorney's Office for the District of Massachusetts

30.) Andrew Levchuk, Senior Trial Attorney (2007-11), Public Integrity Section, Criminal Division; Senior Counsel (2005-07), Computer Crime and Intellectual Property Section; Senior Trial Attorney (2003-05), Office of International Affairs; Assistant U.S. Attorney (1992-2003), U.S. Attorney's Office for the District of Massachusetts

31.) David Schwendiman, Interim U.S. Attorney (1998), First Assistant U.S. Attorney, (1993-1998), and Assistant U.S. Attorney (Senior Litigation Counsel) (1987-1998), U.S. Attorney's Office for the District of Utah

32.) Mark Werder, Civil Chief (1982-84) and Assistant U.S. Attorney (1978-82), U.S. Attorney's Office for the Eastern District of Michigan

33.) James Becker, Chief, Major Crimes Section (1987) and Assistant U.S. Attorney (1981-87), U.S. Attorney's Office for the Eastern District of Pennsylvania

34.) Krishna "Kris" Dighe, Senior Counsel (2012-25), Assistant Chief (2006-12), Senior Trial Attorney (2004-06), Environmental Crimes Section, Environment and Natural Resources Division; Assistant U.S. Attorney (1994-2004), U.S. Attorney's Office for the Eastern District of Michigan

35.) Raymond Granger, Assistant United States Attorney (1992-98), U.S. Attorney's Office for the Eastern District of New York

36.) Robert Steinberg, Senior Assistant U.S. Attorney (1968-78), U.S. Attorney's Office for the Southern District of Ohio

37.) Michael Tuteur, Assistant US Attorney (1991-1994), U.S. Attorney's Office for the District of Massachusetts

38.) A. Carley Palmer, General Crimes Section Deputy Chief (2021-23) and Assistant U.S. Attorney (2016-24), U.S. Attorney's Office for the Central District of California

39.) Brian Legghio, Assistant United States Attorney (1982-88), U.S. Attorney's Office for the Eastern District of Michigan

40.) Sonia W. Murphy, Trial Attorney, Civil Division, Commercial Litigation Branch, National Courts Section (2018-24); Senior Trial Counsel (2024-25), Special Assistant United States Attorney (2023-25), U.S. Attorney's Office for the District of Columbia

41.) Samuel Bagenstos, General Counsel, U.S. Department of Health and Human Services (2022-24); General Counsel, Office of Management and Budget (2021-22); Principal Deputy Assistant Attorney General (2010-11), Deputy Assistant Attorney General (2009) and Trial Attorney (1994-97), Civil Rights Division

42.) Daniel Anderson, Deputy Director, Fraud Section of the Civil Division; Trial Attorney, Senior Counsel, Assistant Director Health Care Fraud (1996-2019)

43.) Ann Powers, Trial Attorney, Land and Natural Resources Division (1979-84); Assistant U.S. Attorney (1975-79), U.S. Attorney's Office for the District of Columbia

44.) Elizabeth Langer, Trial Attorney, Civil Division, U.S. Department of Justice (1976-98)

45.) Subodh Chandra, Assistant U.S. Attorney (1999-2002), U.S. Attorney's Office for the Northern District of Ohio

46.) Steven Gold, Assistant U.S. Attorney (1985-1990), Deputy Criminal Chief (1989-90), U.S. Attorney's Office for the Eastern District of New York

47.) Laura Sagolla, Assistant U.S. Attorney (2010-18), U.S. Attorney's Office for the Eastern District of Michigan

48.) Steven Kazan, Assistant U.S. Attorney (1969-71), U.S. Attorney's Office for the Northern District of California

49.) Harriett Galvin, Assistant U.S. Attorney, Appellate Division, (1987-2015), U.S. Attorney's Office for the Southern District of Florida

50.) Celeste Miller, Assistant U.S. Attorney, U.S. Attorney's Office for the District of Idaho; Special Assistant U.S. Attorney, U.S. Attorney's Offices for the Districts of Western Washington, Oregon, Central District California, Utah, and Idaho (1987-2012)

51.) Mark Berthiaume, Assistant U.S. Attorney (1983-86), U.S. Attorney's Office for the District of Maryland

52.) Margo Schlanger, Officer for Civil Rights and Civil Liberties for the U. S. Department of Homeland Security (2010-12); Trial Attorney, Civil Rights Division (1995-98), U.S. Department of Justice

53.) Peter K. Vigeland, Chief, Major Crimes (1994 - 1996) and Assistant United States Attorney (1989 - 1994), United States Attorney's Office for the Southern District of New York.

54.) Sheila Sawyer, Assistant U.S. Attorney (1992-2001, 2014-2025), U.S. Attorney's Office for the Districts of Massachusetts and Maine

55.) Lynn Helland, Supervisory Assistant U.S. Attorney (1989-2017) and Assistant U.S. Attorney (1982-1989), U.S. Attorney's Office for the Eastern District of Michigan